## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| YAMAMOTO MITCHELL and | § | |
| WALTER MITCHELL, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-2444 |
| | § | |
| METCO, INC., MEMHET HAZIRLAR, | § | |
| and J. RICHARD PECK, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This case arises from the alleged failure of vessel owners to pay the wages due to their crew members. This Court has admiralty jurisdiction over this claim pursuant to 28 U.S.C. § 1333. A bench trial was conducted on November 6, 2006, and Pursuant to Federal Rule of Civil Procedure 52, the Court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

1. The vessel M/V Glorita ("the *Glorita*") was purchased by Defendants Memhet Hazirlar and J. Richard Peck on January 16, 2003. Each acquired a 50% ownership interest in the vessel.

2. Soon after the purchase, Mr. Hazirlar attempted to convey his personal 50% ownership interest to Metco, Inc. ("Metco"), a corporation in which he was the sole shareholder.

3. Because of some complications with the necessary paperwork, the precise date upon which this transfer was accomplished is disputed. The Coast Guard's Abstract of Title for the *Glorita* reports that Mr. Hazirlar transferred a 100% interest in the vessel to Metco in January 2003, and that he later transferred a 50% interest in the vessel to Metco in March 2003. (Def.'s Ex. 1.) It is impossible to give effect to both conveyances, first, because Mr. Hazirlar never owned 100% of the vessel, and second, because one who sells a 100% interest is left with nothing else to convey.

1

4. Mr. Hazirlar testified that he executed a bill of sale on January 29, 2003 (Def.'s Ex. 17), with the intent to transfer his personal 50% ownership interest in the vessel to Metco, his corporation. However, the Coast Guard rejected the bill of sale and sent it back to him because of an error he committed in filling out the paperwork. Line 4A of the preprinted bill of sale requires the seller to fill in the total interest transferred. Mr. Hazirlar entered 100%, when in fact he owned only 50% of the *Glorita*, and thus could transfer no more than a 50% interest in the vessel. The Coast Guard asked Mr. Hazirlar to resubmit the form with this entry corrected, which he did on March 12, 2003. (Def.'s Ex. 20.)

5. Mr. Hazirlar's testimony leads the Court to conclude that the second bill of sale is the binding one. While Mr. Hazirlar intended to convey his 50% interest in the vessel to Metco in January, he did not successfully do so until March. Thus, Mr. Hazirlar and Mr. Peck were co-owners of the *Glorita* until March 12, 2003, at which time Metco and Mr. Peck became co-owners of the vessel.

6. Shortly after Mr. Peck and Mr. Hazirlar purchased the vessel, on or around January 28, 2003, Mr. Peck came to Mr. Hazirlar and requested use of the *Glorita*. Mr. Peck explained that he had a contract to transport oilfield equipment from New Orleans to Trinidad, but that his other tugboat, the *Captain Peck*, had sunk. He asked Mr. Hazirlar if he could use the *Glorita* to complete the voyage, and Mr. Hazirlar consented.

7. On or around February 1, 2003, Mr. Peck took the *Glorita* to a shipyard in Louisiana to undergo repairs and prepare for the voyage.

8. While there, Mr. Peck hired a crew for the voyage, which included Plaintiff Walter Mitchell. Mr. Mitchell was employed as chief cook and was promised wages of $80 per day.

9. The *Glorita* departed New Orleans on or around March 20, 2003, towing two barges of oilfield equipment. It arrived in Trinidad on or around April 7, 2003.

10. The crew members were not paid their wages upon arrival in Trinidad.

11. The parties dispute the number of days that Walter Mitchell worked on board the *Glorita*. Mr. Mitchell testified that he joined the crew of the *Glorita* and began performing his duties as chief cook on February 19, 2003, when the vessel was docked at the shipyard in Louisiana. However, Mr. Hazirlar testified that he visited the *Glorita* at the shipyard from March 8 to March 10, 2003, and that no crew members other than Mr. Peck were on board at that time.

12. Mr. Mitchell's testimony regarding the days he worked was supported by written evidence in the form a copy of what appears to be a page from the *Glorita*'s log book. (Pl.'s Ex. 6.) Mr. Mitchell's name is written at the top of the page, and underneath is printed "$80.00 per day." The document then itemizes the number of days Mr.

Mitchell worked per month and the total wages due to him.  It indicates that Mr. Mitchell joined the *Glorita*'s crew on February 19, 2003,[1] and worked ten days in February, twenty-eight and one-half days in March, and fifteen days in April.  The document then rounds the total number of days worked down to fifty-three and lists the total wages earned as $4240.00.  There is then a deduction of $234.91 for funds received as an advance, and $4005.09 is listed as the total amount of wages due.

13. Although Defendants questioned the authenticity of this document, the Court is persuaded that it is the most reliable source for determining the days worked by Mr. Mitchell.  It was apparently signed by Mr. Mitchell on April 14, 2003, and it also bears the signature of Captain Peck and an attorney, as well as the *Glorita*'s official vessel stamp.  While Defendants pointed out that Mr. Mitchell may have had access to the vessel's stamp, they provided no concrete evidence suggesting that the document is a forgery.

14. Thus, the Court is persuaded that Mr. Mitchell began working aboard the *Glorita* on February 19, 2003, and is entitled to wages for fifty-three and one-half days, minus the advance of $234.91 that he received.

15. Although Mr. Hazirlar consented to allow Mr. Peck to utilize the *Glorita* for this voyage to Trinidad, all communication between them ceased in March, before the *Glorita* even left New Orleans.  Mr. Hazirlar made repeated attempts to contact Mr. Peck, but those attempts were unsuccessful.  He had purchased a satellite phone for the vessel, but all of his calls to it went unanswered and his messages were unreturned.

16. Mr. Hazirlar heard nothing from the *Glorita* until June 18, 2003, when he received a phone call from the United States Embassy in Trinidad informing him that the ship's crew was in Trinidad and needed to be paid.  Mr. Hazirlar asked the Embassy employee to relate his contact information to the crew.

17. Shortly thereafter, Mr. Hazirlar received a phone call from Nari Alfonso, who purported to be an attorney representing the crew.  Ms. Alfonso told Mr. Hazirlar that the crew's wages must be paid or the boat would be arrested.  Mr. Hazirlar, still unable to reach Mr. Peck and anxious to regain control of the boat, asked Ms. Alfonso to arrest the vessel and sell it.

18. The *Glorita* was in fact arrested on July 22, 2003, at the order of Trinidad and Tobago's High Court of Justice.

19. Then, on August 11, 2003, Ms. Alfonso sent a letter to Mr. Hazirlar demanding payment of a compromised amount of wages for each crew member, including Mr. Mitchell.  (Def.'s Ex. 3.)

---

[1] The document actually lists the "on board" date as March 19 ("19-03"), however it is clear from the rest of the document that this was a clerical error and February 19 was the date intended.

20. Mr. Mitchell testified that he never authorized Ms. Alfonso to act as his attorney.

21. Mr. Hazirlar never paid Mr. Mitchell the amount of wages demanded in Mr. Alfonso's letter, nor did Mr. Mitchell receive payment from anyone else.

22. Meanwhile, even though the vessel was under arrest in Trinidad, Mr. Peck somehow managed to take the *Glorita* and set sail with it.

23. After learning that the vessel was missing from Trinidad, Mr. Hazirlar contacted the Coast Guard in St. Vincent and the Grenadines in an effort to locate it.  He eventually reported the vessel stolen on September 10, 2003.

24. Nonetheless, Mr. Hazirlar was still able to find a buyer interested in purchasing his company's interest in the *Glorita*, and on October 7, 2003, Mr. Hazirlar sold Metco's 50% share of the vessel to Keith Arjoon, a resident of Trinidad, for $35,000.

25. Mr. Mitchell has filed suit against Mr. Hazirlar, Metco, and Mr. Peck to recover his wages.  Mr. Peck has not appeared in this action.

## II. CONCLUSIONS OF LAW

1. 46 U.S.C. § 10313 (2006) provides that if, at the end of a voyage, a seaman is not paid his wages without sufficient cause, then the master or owner of the vessel must pay the seaman a penalty of two days' wages for each day payment is delayed.[2]

2. Failure to pay wages is without sufficient cause only when it is arbitrary or willful, and not attributable to impossibility of payment.  *Collie v. Ferguson*, 281 U.S. 52, 55 (1930).

3. Mr. Hazirlar and Metco have not shown sufficient cause for their failure to pay Mr. Mitchell's wages.  There was no testimony that they were unable to pay.  They had notice of the wage demands of the crew and simply failed to pay.

4. Mr. Hazirlar and Metco argue that there was sufficient cause for their failure to pay because they had no control over the vessel *Glorita* during its voyage.  They analogize the situation in this case to a bareboat charter, in which the charterer has

---

[2] The full text of the statute provides:

> (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier.  When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.
>
> (g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

46 U.S.C. § 10313.

possession and exclusive control over the vessel and the registered owner is therefore absolved of liability for crew wages.

5.  It is true that when an owner of a vessel enters into a demise or bareboat charter that renders another entity the owner *pro hac vice* of the vessel, it is the owner *pro hac vice* who is liable for any wage penalty. *Williams v. Wilmington Trust Co.*, 345 F.3d 128, 134 (2d Cir. 2003).  However, there is no evidence in this case that Mr. Hazirlar/Metco and Mr. Peck entered into a bareboat charter.  There was no writing to that effect.  Nor would it apparently be typical for co-owners to enter into a bareboat charter, as charterers are typically lessees of the vessels, rather than co-owners.  Defendants have not pointed to any case in which a court inferred that a vessel owner entered into a bareboat charter with his co-owner, so without a writing to establish that there was in fact a bareboat charter entered into in this case, the Court cannot find that one existed.  Because there is no evidence of a bareboat charter between Mr. Hazilar/Metco and Mr. Peck, Mr. Hazirlar/Metco remain "owners" of the *Glorita* within the meaning of 46 U.S.C. § 10313.

6.  As owners of the vessel who have not shown sufficient cause for their failure to pay the crew's wages, Mr. Hazirlar and Metco are liable for penalty wages.

7.  Mr. Hazirlar argues that even if penalty wages are to be assessed, they should be imposed only on Metco and not on Mr. Hazirlar personally.

8.  Mr. Hazirlar owned a 50% share of the *Glorita* in his personal capacity when Mr. Mitchell began his service on board the vessel on February 19, 2003.  Mr. Hazirlar then conveyed his personal interest to Metco on March 12, 2003, midway through the *Glorita*'s voyage.  At the conclusion of Mr. Mitchell's service on board the *Glorita* on or about April 15, 2003, Metco remained 50% owner of the vessel.

9.  Mr. Hazirlar argues that because 46 U.S.C. § 10313(f) provides that a seaman's wages are to be paid by the master or owner "[a]t the *end* of a voyage," and Mr. Hazirlar was no longer an owner in his individual capacity at the end of the *Glorita*'s voyage, he should not be personally responsible for paying Mr. Mitchell's wages.

10. However, section (a) of the same statute provides that "[a] seaman's *entitlement* to wages . . . begins when the seaman begins work . . . ."  46 U.S.C. § 10313(a) (emphasis added).  Thus, the obligation for Mr. Mitchell's wages arose while Mr. Hazirlar was still owner of the *Glorita* in his personal capacity.

11. The Second Circuit has, in dicta, contemplated the possibility of multiple "owners" within the meaning of the statute, each of whom may be liable for wage penalties.  This would "enable sailors to sue whomever holds apparent authority without needing to sort out actual ownership."  *Williams*, 345 F.3d at 134.  This rationale supports permitting seamen to recover wages from the entity that owned the vessel at the start of the voyage, because the onus should not be on the crew members to sort out any conveyances of the vessel that may have taken place while they were on board.

12. Thus, because the obligation for a seaman's wages attaches when he begins work, and Mr. Hazirlar was personally part-owner of the *Glorita* when Mr. Mitchell began work on board, Mr. Hazirlar in his personal capacity is jointly and severally liable for Mr. Mitchell's wages.

### III. CONCLUSION

For the reasons stated above, **JUDGMENT IS ENTERED** for Plaintiff.  Plaintiff is entitled to penalty wages for which Mr. Hazirlar and Metco are jointly and severally liable. Plaintiff should prepare and submit an agreed order of judgment computing the amount of damages.  Each party is to bear its own costs and attorney's fees.

**IT IS SO ORDERED.**

**SIGNED** this 7th day of June, 2007.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT